**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MICHAEL F. D.,[1]

                             Plaintiff,                    3:19-cv-00600 (BKS)

v.

ANDREW SAUL, Commissioner of Social Security,

                             Defendant.

**Appearances:**

*For Plaintiff:*
Kenneth Hiller
Law Officers of Kenneth Hiller
6000 N. Bailey Ave., Suite 1A
Amherst, New York 14226

*For Defendant:*
Antionette T. Bacon
Acting United States Attorney
Rebecca H. Estelle
Social Security Administration
26 Federal Plaza
New York, New York 10278

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

Plaintiff Michael F. D. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security denying Plaintiff's application for Social

Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties' briefs, filed in

accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 10, 11).

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

After carefully reviewing the Administrative Record,[2] (Dkt. No. 7), and considering the parties'

arguments, the Court reverses the Commissioner's decision and remands this matter for further

proceedings.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff applied for SSDI benefits on February 2, 2016, alleging that he had been

disabled since March 21, 2015. (R. 52). The Commissioner denied the claim on July 1, 2016. (R.

68-73). Plaintiff appealed that determination, and a hearing was held before Administrative Law

Judge ("ALJ") Bruce S. Fein on May 8, 2018, at which Plaintiff was represented by counsel. (R.

24-51). On June 14, 2018, the ALJ issued a decision finding that Plaintiff was not disabled

within the meaning of the Social Security Act. (R. 10-19). Plaintiff then filed a request for a

review of that decision with the Appeals Council, which denied review on March 23, 2019. (R.

1-3). Plaintiff commenced this action on May 21, 2019. (Dkt. No. 1).

### B.   Plaintiff's Background and Testimony

Plaintiff was 38 years old when he applied for SSDI benefits in February 2016. (R. 126).

He completed three years of college[3] and has a license in massage therapy. (R. 30, 227). Plaintiff

has previously held various jobs—including as a massage therapist, nurse's aide, running a

portable photo booth, and HVAC servicing.[4] (R. 30, 32-42). Plaintiff was attending college and

working part-time as a nurse's aide until he was hospitalized for depression in 2016. (R. 33). He

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 7), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

[3] Plaintiff attended college until 2015. (R. 30). He was three classes short of earning an associate degree. (*Id.*).

[4] Plaintiff installed and repaired commercial and residential heating, ventilation, and air conditioning systems.

continued working as a nurse's aide "[f]or a little while" after his hospitalization. (R. 34). He

was not working at the time of the hearing. (R. 30).

Plaintiff lives with his wife and teenage child. (R. 29). He has a driver's license and

drives every day to pick his son up from school. (R. 49). He spends his day doing housework,

including the "dishes, laundry, stuff that needs to get done." (R. 44). He goes grocery shopping

but has "to have a specific list" or he will not "remember what to get." (R. 44). He takes his son

"hiking and stuff, [and] takes him to the movies." (*Id*.). He helps his son with his homework. (R.

45). Plaintiff generally gets along with others "pretty good" although he does have unpredictable

mood swings and could be "angry or irritable" or "depressed." (R. 46). He described his energy

level during the day as "pretty low" and explained that he has "low motivation" so he doesn't

"really do much." (R. 43). Plaintiff was an alcoholic; he stopped drinking in 2006. (R. 348-349).

Plaintiff has rapid cycling bipolar disorder. (R. 46). In 2016, he was "severely depressed"

and struggled "to make it through the day." (R. 38). In October 2016, Plaintiff was hospitalized

for depression. (R. 38, 243-68). Although the hospital "changed [his] medications" and put him

in a "group setting" and "group meetings," Plaintiff testified that he did not think his mood "was

much better" and that he was "still depressed." (*Id*.). After his hospitalization, Plaintiff went to

therapy once a month, did "activities at home," and went "for walks and [tried] to keep [himself]

busy" to improve his mood. (R. 39).

Previously Plaintiff felt that his medications made him "really tired" and that it was "hard

to get out of bed sometimes." (R. 38). He had a difficult time getting "through the day without. . .

massive amounts of coffee." (*Id*.). Although Plaintiff felt that the new medications he was taking

after his hospitalization were "a little better, but still not great," they did not cause any side

effects. (R. 40).

3

Plaintiff testified that he has had pain in his left knee "[s]ince high school." (R. 42). He explained that he had a tear in the meniscus and has had several knee surgeries. (R. 42-43). Plaintiff's knee problems impacted his work occasionally in the past because "when [his knee] gets sore" he has to "wear a brace or slow down." (R. 42). Plaintiff testified that he is not currently being treated for his knee and that he uses medical marijuana for knee pain. (R. 42-43).

### C.    Medical Evidence and Opinions[5]

#### 1.    Dr. Jennifer H. Gunn, MD

Dr. Gunn, a psychiatrist, treated Plaintiff for bipolar disorder from December 2010 until April 2015. (R. 37, 346-53). Records prior to 2015 include: a diagnosis in March 2013 of "[s]ituational stress with acute grief" following the death of Plaintiff's father, Plaintiff's friend's car accident, and the death of another friend, (R. 349); Plaintiff's report of "occasionally [having] nocturnal panic attacks particularly during times of change or stress" on February 10, 2014, (Id.); Plaintiff's report, on April 17, 2014, that "he ha[d] developed mild paranoia," which led Dr. Gunn to increase Plaintiff's lithium and start him on quetiapine, (R. 349-50); and evidence of improvements in 2014 following his May 28, 2014 appointment. (R. 351).

On January 1, 2015, Plaintiff reported that his mood fluctuated "between mildly depressed and mildly activated." (R. 352). Dr. Gunn suggested he restart the quetiapine to help level his mood. (Id.). On February 4, 2015, Plaintiff was "coming out of a hypomanic state." (Id.). By February 26, 2015, Plaintiff's mood had "evened out considerably" and he was having "fewer boots of irritability and less anxiety." (Id.). Plaintiff continued to work part-time and go to school part-time. (Id.).

---

[5] Plaintiff received therapy and medication management from Dr. Brian Babiak, a psychiatrist, during 2016. (R. 40, 227, 287). Plaintiff received a medical marijuana card from Dr. Babiak on January 25, 2017. (R. 28, 40). Plaintiff estimated using a gram of marijuana daily. (R. 41). The ALJ noted that the Agency sent Dr. Babiak four separate requests for evidence, but did not receive anything from him. (Id.).

Dr. Gunn last saw Plaintiff on April 9, 2015, where she noted he was "depressed, with intense anxiety especially in the AMs." (R. 353). He had a "depressed and tearful affect" and "had to drop out of school again." (*Id*.). One of his medications, Sertraline, had "caused a severe hypomania" but he had no "suicidal thoughts" and "no psychosis." (*Id*.).

### 2.    Dr. Sara Long, PhD

Plaintiff met with Dr. Long, a psychologist, for a consultative psychiatric examination on June 14, 2016. (R. 227). According to Dr. Long's assessment, Plaintiff reported a history of alcohol abuse that included a prior psychiatric hospitalization in 2006 for "alcohol," and that he last consumed alcohol in 2006. (R. 227-28). Plaintiff stated that he received outpatient treatment in March of 2016 with a social worker, but felt the social worker was "too focused on alcohol." (R. 227). Plaintiff reported that he saw Dr. Babiack monthly for medication management, and was currently taking: Lithium, Latuda, diazepam, bupropion, and Adderall. (*Id*.) Plaintiff reported manic episodes. (*Id*.). He described feeling "jittery" and talking "fast, a bunch of words into a sentence." (*Id*.). He stated his last manic episode was "six, seven months ago" and that it forced him to withdraw from school. (*Id*.). He described going into a deep depression for several months following the episode and isolating at home. (*Id*.). He reported working one day a week. (*Id*.).

Following a mental status examination, Dr. Long reported that Plaintiff's speech was "fluent and clear" and his through process was "coherent and goal orientated" with "no indication of any sensory or thought disorder." (R. 228). Plaintiff displayed "a full range of appropriate affect in speech and thought content." (*Id*.). Dr. Long described Plaintiff's mood as "euthymic" and noted that his orientation was "intact." (*Id*.). Dr. Long also noted that both Plaintiff's attention and concentration as well as recent and remote memory skills were intact.

(*Id*.). Dr. Long reported that Plaintiff appeared to be "functioning on an average intellectual level with a good fund of information" and that his insight and judgment were "fair." (*Id*.).

Dr. Long observed no limitations regarding "following and understanding simple directions and performing simple tasks." (*Id*.). Dr. Long opined that Plaintiff can "learn new tasks, perform complex tasks, make appropriate decisions within context, relate adequately with others, and it capable of adequate stress managements[.]" (*Id*.). However, Dr. Long added that "stress would exacerbate symptoms" and "[w]hen symptoms are active, this would be expected to negatively impact general functioning." (*Id*.). Dr. Long found the results of the evaluation to be consistent with "psychiatric and history of substance abuse problems, which may interfere with his ability to function on a regular basis." (*Id*.). Dr. Long diagnosed Plaintiff with bipolar disorder, "substance abuse, alcohol, in remission," and attention-deficit disorder. (*Id*.). Dr. Long opined that Plaintiff had a good prognosis "to maintain current level of part-time employment," but "given severity of symptoms and need to maintain stress at a manageable level, increased function would not be expected." (*Id*.).

### 3.    Dr. D. Brown, PsyD

On July 1, 2016, Dr. Brown conducted a record review in connection with Plaintiff's original disability determination. (R. 57-64). He indicated that from his review, Plaintiff had "understanding and memory limitations" as well as "social interaction limitations." (R. 59-60). He also found Plaintiff to be "moderately limited" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 60). He further noted that Plaintiff was "moderately limited" in his "ability to respond appropriately to changes in the work setting" and had "adaptation limitations." (R. 61). Dr. Brown opined that as long as

Plaintiff "remain[ed] medicated, [Plaintiff] retains the mental ability to perform the basic demands of unskilled work and some semiskilled work on a sustained basis." (R. 62).

### 4.     Dr. Charles McGurk, MD

On October 15, 2016, Plaintiff went to the emergency department of Guthrie Robert Packer Hospital. (R. 243). He complained of "worsening depression" and of "functioning very poorly at home." (R. 248). His wife felt she could not leave him alone "because he may harm himself." (R. 243). Plaintiff was seen by Dr. McGurk, a psychiatrist. (R. 243). Plaintiff reported that he had not been showering and had "been staying in the house all the time." (R. 248). He also reported decreased appetite, loss of libido, and anergia. (*Id*.). He denied having suicidal thoughts or crying spells. (*Id*.). Due to his depression, Dr. Babiack had made changes to Plaintiff's medication which Plaintiff felt were unsuccessful. (*Id*.).

Following a mental status examination, Dr. McGurk found Plaintiff to be alert and cooperative. (R. 249). He described Plaintiff's eye contact as "good" but found his affect to be "mildly to moderately constricted." (*Id*.). Plaintiff's mood was depressed, and "thought [was] goal-directed without delusions or hallucinations." (*Id*.). Dr. McGurk admitted Plaintiff on a voluntary status for diagnostic evaluation and "therapeutic program including individual and group psychotherapy and pharmacotherapy." (R. 250).

Plaintiff was discharged on October 22, 2016. (R. 252). His discharge papers noted that Plaintiff "participated actively in the treatment program, including individual and group psychotherapy and pharmacotherapy." (R. 252). Several of Plaintiff's medications were changed, including lowering the dose of diazepam and Latuda and discontinuing Prozac. (R. 252-53). Dr. McGurk noted that Plaintiff "secluded himself in his room much of the time" but eventually "began being more active in the milieu." (R. 253). Plaintiff tolerated the medication changes well. (*Id*.). Prior to discharge, Dr. McGurk found Plaintiff to have full affect and to be "alert and

7

cooperative" with "good eye contact." (*Id*.). Plaintiff expressed a hopeful mood, normal speech, and goal-oriented thought without delusions or hallucinations. (*Id*.). Plaintiff was referred back to Dr. Babiak for follow-up. (*Id*.).

### 5.    The Center for Holistic and Integrated Mental Health

On January 4, 2017, Plaintiff saw Jensyn Seely, R.N., at the Center for Holistic and Integrated Mental Health. (R. 286). He sought medication management and therapy for his bipolar disorder. (*Id*.). He complained of a "depressed period" for the past several months and described being manic that morning and lashing out "verbally at [his] wife." (*Id*.). He also complained of low motivation, anger and irritability, nervousness, racing thoughts, excessive worry, tearful episodes, and occasional indecisiveness. (*Id*.). He did not complain of a change in appetite or sleep and denied being withdrawn from others. (*Id*.). Plaintiff described his mood as "just okay." (*Id*.). Nurse Seely noted his affect as "flat, depressed, tearful" and his behavior as "cooperative" with "poor eye contact." (R. 289.). Plaintiff described his initial treatment goals as: "I just want to get out of this depression, I want to be able to manage my life a little better and have some tools to work with." (*Id*.).

On March 31, 2017, Plaintiff saw Stephanie King, D.N.P., at the Center for Holistic and Integrated Mental Health. (R. 284). Plaintiff described being in a "depressed phase for two years" and wanting to "work on rage control." (*Id*.). He denied feeling overmedicated. (*Id*.). King decreased the dosage of lithium, increased the dosage of Latuda, and started Plaintiff on trazodone. (R. 283).

On May 26, 2017, at another appointment with King, Plaintiff felt that he had "maybe a little more energy." (R. 282). However, he still felt "depressed" and was "sitting around a lot, not doing much." (*Id*.). On June 28, 2017, Plaintiff expressed to King that his moods were "dull." (R. 281). King noted that Plaintiff was experiencing "restlessness and akathisia." (*Id*.). On August 9,

2017, Plaintiff saw Karen Conklin, P.C., and complained that he continued to feel "blah and lifeless." (R. 280). Conklin noted his affect was "flat and emotionless." Plaintiff "processed frustration and anger that 'he is this way.'" (*Id*.).

On November 8, 2017, Plaintiff expressed to King that he was feeling "better." (R. 273). He described having "a little more energy," "no big mood swings," and that his "sleep is good." (*Id*.). He was not experiencing anger or irritability, but his focus was "still iffy" and his motivation "a little low." (*Id*.). He does a lot of "sitting" and "sometimes cleans the house." (*Id*.). Plaintiff was "looking into throwing pottery" and "finding it easier to think." (*Id*.). He was not experiencing medication side effects. (*Id*.). On December 12, 2017, Plaintiff told King that he was feeling "a little stressed." (R. 272). On February 28, 2018, Plaintiff "relate[d] he is still feeling kind of depressed" and "still pretty unmotivated." (R. 271). He reported "some anger and irritability" but was "not getting upset about" the lack of anxiety. (*Id*.).

D.      **The ALJ's Decision Denying Benefits**

On June 14, 2018, the ALJ issued a decision denying Plaintiff's claim. (R. 10). In reaching that conclusion, the ALJ applied a "five-step sequential evaluation process for determining whether an individual is disabled."[6] (R. 11). The ALJ's analysis at each step is

---

[6] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

summarized below.[7]

### 1. Steps One, Two, and Three

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 21, 2015, the alleged onset date. (R. 12). At step two, the ALJ determined that Plaintiff had the following severe impairment: "Bipolar Disorder." (*Id.*). The ALJ found that while the record indicated Plaintiff had "Sleep Apnea," a left knee impairment, and "Alcohol Abuse in Remission & Cannabis Use Disorder," the record did not indicate these conditions would impose "more than minimal limitations on [Plaintiff's] ability to perform basic work activities." (R. 13).[8] The ALJ also noted that the record was "devoid of objective medical evidence to establish attention deficit hyperactivity disorder as one of the claimant's medically determinable impairments." (*Id.*).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*). Specifically, the ALJ found that "the severity of the [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04." (*Id.*). The ALJ considered whether "the 'paragraph B' criteria are satisfied." (R. 13-14). "To satisfy the 'paragraph B' criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing themselves." (R. 14). The ALJ

---

[7] As an initial matter, the ALJ determined that Plaintiff "meets the insured status requirements of the Social Security Act through December 30, 2021." (R. 12).

[8] Plaintiff does not challenge the ALJ's finding at step two that his Sleep Apnea, knee impairment, Attention Deficit Hyperactivity Disorder, or Alcohol Abuse in Remission & Cannabis Use Disorder were nonsevere.

determined that "[b]ecause the [Plaintiff's] mental impairments do not cause at least two

'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." (R.

15). In reaching this conclusion, the ALJ found that Plaintiff has: (1) mild limitations

"interacting with others," (2) moderate limitations "concentrating, persisting, or maintaining

pace," and (3) mild limitations "adapting or managing oneself." (R. 14).

The ALJ also considered "whether the 'paragraph C' criteria are satisfied." (R. 15). The

ALJ determined that the "evidence fail[ed] to establish the presence of the 'paragraph C'

criteria" because "[t]he record did not evidence 'only marginal adjustment.'" (*Id*.).

## 2.    Plaintiff's Residual Functional Capacity (RFC)

Because Plaintiff's impairments did not meet or equal a listed impairment at step three,

the ALJ then assessed Plaintiff's RFC.[9] The ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," but that [Plaintiff's]

statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record." (R. 17).

In support of the finding and the overall RFC, the ALJ considered that while Plaintiff

alleged "low energy level, low motivation, mood swings, anxiety, trouble remembering things,

problems sleeping, and problems paying attention," Plaintiff "had mostly negative clinical

findings and was able to perform quite a few activities." (R. 16). These activities included

"taking care of his son, having no problems with personal care, not needing reminders to take

medication, preparing food, doing house and yard work, walking places, driving, shopping in the

store and by computer, being able to pay bills, and having no problems getting along with people

---

[9] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] mental limitations and restrictions and then determine…[the] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(c).

in authority, and being able to finish what he starts and follow spoken and written instructions."

(*Id*.).

The ALJ assigned the following weights to the various medical opinions contained within the record regarding Plaintiff's limitations:

1. The ALJ gave "some weight" to the opinion of the consultative examiner, Dr. Long, that Plaintiff "is able to learn new tasks, perform complex tasks, make appropriate decisions within context, relate adequately with others, and is capable of adequate stress management, but it appears that stress would exacerbate his symptoms." (R. 16).

2. The ALJ gave "some weight" to the opinion of Dr. Brown, the state reviewing psychologist, that Plaintiff has "some moderate limitations, but, so long as he remained medicated, retained the ability to perform the basic demands of unskilled work and some semi-skilled work on a sustained basis." (*Id*.).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff "has the residual function capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: he is limited to a low stress job defined as only occasional decision-making, changes in work setting, and judgment required." (R. 15).

### 3. Steps Four and Five

At step four, the ALJ determined that "[a]lthough the [Plaintiff] may be able to perform the requirements of some of his past relevant work, the record did not definitively establish such." (R. 17). Therefore, the ALJ proceeded to step five.

At step five, the ALJ found that "[c]onsidering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform." (R. 18). While Plaintiff's "ability to perform work at all exertional levels has been compromised by non-exertional limitations," the limitations "have little or no effect on the occupational base of unskilled work at all exertional levels." (*Id*.). There was no vocational expert testimony, and the ALJ relied on the framework of

the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grid") in

making the determination that Plaintiff was not disabled. (R. 18).

## III.   DISCUSSION

### A.     Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does

not determine de novo whether Plaintiff is disabled. Rather, the Court must review the

administrative record to determine whether "there is substantial evidence, considering the record

as a whole, to support the Commissioner's decision and if the correct legal standards have been

applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than

a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate

to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447-48 (2d Cir.

2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very

deferential," and the Court can reject the facts that the ALJ found "only if a reasonable factfinder

would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290

(8th Cir. 1994)).

### B.     Analysis

Plaintiff argues that the Commissioner erred in two ways when denying his claim.

Specifically, he claims that: (1) the Commissioner failed to account for limitations in Dr. Long's

opinion, and (2) the Commissioner erred at step five by relying on the Grid without vocational

expert testimony. (Dkt. 10-1, at 6, 11).

#### 1.     Dr. Long's Opinion

Plaintiff argues that the ALJ erred in failing to credit, or explain why he did not credit,

consultative examiner Dr. Long's prognosis that Plaintiff was able to "maintain current level of

part-time employment," but that "[g]iven severity of symptoms and need to maintain stress at a

manageable level, increased function would not be expected." (Dkt. No. 10-1, at 6-7; R. 230).

Plaintiff interprets Dr. Long's prognosis as limiting him to part-time work and argues that if the

ALJ "[h]ad included these limitations," in formulating his RFC, "Plaintiff would have been

disabled." (Dkt. No. 10-1, at 8). Defendant, on the other hand, contends that "a fair reading of

this statement is that [Dr. Long] did not expect Plaintiff to be able to do his *current* job, as a

home health aide, full-time." (Dkt. 11, at 8).

The ALJ's failure to expressly acknowledge Dr. Long's prognosis does not warrant

remand. *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence

of record permits us to glean the rationale of an ALJ's decision, we do not require that he have

mentioned every item of testimony presented to him or have explained why he considered

particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

"Although required to develop the record fully and fairly, an ALJ is not required to discuss every

piece of evidence submitted" and "[a]n ALJ's failure to cite to specific evidence does not

indicate that such evidence was not considered." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d

443, 448 (2d Cir. 2012) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).

The ALJ's findings are consistent with Dr. Long's medical source statement, which

summarized her examination and specifically set forth Plaintiff's limitations. (R. 227-28). The

medical source statement did not suggest that Plaintiff is limited to part-time work. *See Christina*

*v. Colvin*, 594 Fed.Appx. 32, 33 (2d Cir. 2015) (finding no error in ALJ dismissing a portion of

consultant examiner's opinion where much of the consultant examiner's report supported the

ALJ's findings). Moreover, "[t]here is no requirement that the ALJ accept every limitation in the

opinion of a consultative examiner." *Kitka v. Comm'r of Soc. Sec.*, No. 5:15-cv-0060, 2016 WL

825259, at *9 (N.D.N.Y. Feb. 9, 2016) (citing *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir.

2013)). Further, it appears that the ALJ accounted for Dr. Long's prognosis in finding that Plaintiff could not perform past relevant work, full time, as a home health aide—the employment to which Dr. Long referred in her evaluation.

Plaintiff further argues that the ALJ erred in failing to explain why he rejected Dr. Long's "finding" that general functioning can be negatively impacted when his symptom[s] are exacerbated "to the point that Plaintiff cannot work more than part time." (Dkt. No. 10-1, at 8-9). Dr. Long made no such finding. While the ALJ did not, as Plaintiff asserts, expressly acknowledge this prognosis or Dr. Long's statement that Plaintiff's psychiatric problems "may interfere with his ability to function on a regular basis," an ALJ is not required to "have mentioned every item of testimony presented to him," when "the evidence of record permits [the court] to glean the rationale of an ALJ's decision." *Mongeur*, 722 F.2d at 1040; *see also Lowry v. Astrue*, 474 Fed.Appx. 801, 805 (2d Cir. 2012) (ALJ did not err despite a failure to "meaningfully [] explain his reasons for not crediting certain evidence" because the ALJ was not required to mention every piece of evidence presented).

Plaintiff's suggestion that the ALJ did not properly account for a stress limitation is without merit. The ALJ noted that Dr. Long found that "stress would exacerbate" Plaintiff's symptoms, gave Dr. Long's opinion "some weight," and incorporated a stress limitation into Plaintiff's RFC by finding that "he is limited to a low stress job defined as only occasional decision-making, changes in work setting, and judgment required." (R. 15-16). *See Stadler v. Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. Dec. 11, 2006) ("Because stress is 'highly individualized,' mentally impaired individuals 'may have difficulty meeting the requirements of even so-called "low-stress" jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors

15

affect his ability to work." (citing SSR 85-15)); *see also Moxham v. Comm'r of Soc. Sec.*, No. 16-cv-1170, 2018 WL 1175210, at *10, 2018 U.S. Dist. LEXIS 35157, at *26-27 (N.D.N.Y. March 5, 2018) (nonexertional limits in RFC of "simple tasks, simple instructions, frequent interaction with supervisors, coworkers, and the public, and decisions on simple work-related matters" adequately accounted for "moderate-to-marked limitations in dealing with stress, making appropriate work decisions, and maintaining a regular schedule").

Here the ALJ has adequately detailed the analysis that led to his RFC, concluding that it was supported "[g]iven the [Plaintiff's] activities, his negative clinical findings, and the opinions as weighted above." (R. 17). Specifically, with respect to Dr. Long, the ALJ described Dr. Long's mental status examination of the Plaintiff, the gist of Dr. Long's "medical source statement," and his decision to give her opinion "some weight" "[g]iven her specialty and personal examination" of the Plaintiff. (R. 16).

In any event, remand would not be appropriate because the RFC is supported by substantial evidence in the record. *Mongeur*, 722 F.2d at 1040; s*ee Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("Although there was some conflicting medical evidence" the ALJ's determination was "well supported."); *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)) ("When there is a conflict in the medical evidence, we leave it for the finder of fact to resolve, and '[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.'").

Dr. Brown, the only other medical opinion afforded weight, found that Plaintiff "retained the ability to perform the basic demands of unskilled work and some semi-skilled work on a sustained basis." (R. 16, 62). Dr. Brown noted Plaintiff was "moderately limited" in his "ability to complete a normal workday and work week without interruptions from psychologically based symptoms" and still found Plaintiff able to work "on a sustained basis." (R. 62). The ALJ gave Dr. Brown's opinion "some weight" in determining Plaintiff's RFC. (R. 16).[10]

Furthermore, as the ALJ found, the Plaintiff "was able to perform quite a few activities." (R. 16). The ALJ noted that Plaintiff "reported taking care of his son, having no problems with personal care, not needing reminders to take medication, preparing food, doing house and yard work, walking places, driving, shopping in the store and by computer, being able to pay bills, having no problems getting along with people in authority, and being able to finish what he starts and follow spoken and written instructions." (R. 16). Plaintiff's own statements regarding his daily activities supports the ALJ's determination. In his application from February of 2016, Plaintiff indicated that he did all the house and yard work, took care of his son, drove a car, shopped, paid bills, handled a savings account, could finish what he started, and had no issues with authority. (R. 152-159). During the hearing held in May of 2018, Plaintiff indicated that while he had "pretty low" energy, he did the dishes and laundry, took his son hiking and to the movies, and helped his son with homework. (R. 43-45).

The ALJ's RFC finding is well supported with substantial evidence. *See Matta v. Astrue*, 508 Fed. Appx. 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to

---

[10] Plaintiff does not argue that any other medical source should have been credited, or that Dr. Brown should not have been.

weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also Danielle R. v. Comm'r of Soc. Sec.*, No. 19-cv-538, 2020 WL 2062138, at *13, U.S. Dist. LEXIS 75024, at *34-35 (N.D.N.Y. April 29, 2020) ("Here, the ALJ resolved conflicts between the objective medical record, medical opinion evidence, and plaintiff's testimony by assigning the greatest weight to that evidence that she deemed most consistent with plaintiff's overall treatment record and activities. In doing so, the ALJ appropriately evaluated the conflicting medical evidence, and made an RFC finding that was consistent with the overall record.").

### 2.    The ALJ's Failure to Consult with a Vocational Expert

Plaintiff argues that because the ALJ found his mental impairment limited him to "a low stress job defined as only occasional decision-making, changes in work setting, and judgment required" but failed to explain why these limitations "are of a negligible degree," the ALJ erred in relying on the Grid at step five and should have consulted a vocational expert. (Dkt. 10-1, at 11).

"Once a disability claimant proves that his severe impairment prevents him from performing his past work, the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). At step five, "the burden shifts to the [Commissioner], who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his [] capability, but as well his age, his education, his experience and his training." *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). "In the ordinary case the Secretary satisfies his burden by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2." *Bapp*, 802 F.2d at 604. "The Grid

takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience" and "[b]ased on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. Feb. 23, 1996).

However, "if a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Zabala*, 595 F.3d at 410 (citing *Bapp*, 802 F.2d at 605); *see also Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("[T]he ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."). A nonexertional impairment "significantly limits" the range of work a claimant can perform "when it causes an additional loss of work capacity beyond a negligible one, or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala*, 595 F.3d at 411 (internal quotation marks and alteration omitted).

Here, citing to the framework of the Grid, the ALJ found that "[c]onsidering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform." (R. 18). While the ALJ acknowledged that Plaintiff's "ability to perform work at all exertional levels has been compromised by non-exertional limitations," he opined that "those limitations have little or no effect on the occupational base of unskilled work at all exertional levels." (R. 18). In reaching this conclusion, the ALJ relied on Social Security Ruling 85-15 ("SSR 85-15"), noting that it "provides that so long as an individual can perform the basic mental demands of competitive, remunerative, unskilled work, the individual may be found 'not disabled.'" (R. 18). As the ALJ

noted, SSR 85-15 provides that "[t]he basic mental demands of . . . unskilled work include the abilities, (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15 further provides that: "A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base," and would "justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base." *Id*.

The ALJ, however, did not reconcile his finding that Plaintiff "has no significant limitations in the performance of" the "basic mental demands" of unskilled work, which requires the ability, "on a *sustained* basis" to "deal with changes in a routine work setting," and "respond appropriately" to "usual work situations" with his RFC determination that Plaintiff was "limited to a low stress job" with only "*occasional* decision making [and] changes in work setting." (R. 15, 18). The type of low stress limitations identified in the RFC could significantly limit the range of work available to Plaintiff. *See*, e.g., *Coley v. Colvin*, No. 6:14-cv-06638, 2015 WL 6554982, at *7, 2015 U.S. Dist. LEXIS 146747, at *20 (W.D.N.Y. Oct. 29, 2015) (noting that an RFC assessment limiting the claimant "to a routine and repetitive job with few, if any, changes in the work setting" "precludes him from high volume fast-paced production-rate work with strict quotas or work tasks that are not well-defined"). The ALJ's findings that Plaintiff's nonexertional limitations "have little or no effect on the occupational base of unskilled work" and that Plaintiff "has no significant limitations in the performance of those basic mental demands of work," however, are conclusory and provide no insight into why Plaintiff's stress limitations would cause only a negligible loss in work capacity for unskilled work. (R. 18).

"Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding." *Hernandez v. Colvin*, 13-cv-3035, 2014 WL 3883415 at \*15, 2014 U.S. Dist. LEXIS 109041, at \*46 (S.D.N.Y. Aug. 7, 2014) (citing *inter alia Bapp v. Bowen*, 802 F.2d at 606 (holding that an ALJ must consider an "intermediate question" of whether the range of work the claimant can perform is "so significantly diminished as to require the introduction of vocational testimony")); *see also Chaparro v. Colvin*, 156 F. Supp. 3d 517, 538-39 (S.D.N.Y. 2016) (finding that where the plaintiff could "perform only simple tasks and ha[d] moderate limitations in his concentration persistence and pace" the ALJ's "blanket conclusion" that the plaintiff's "the additional limitations have little or no effect on the occupational base of unskilled sedentary work" was insufficient to permit reliance on the Grid "without any further explanation").

This is not a case where the Court can say that substantial evidence supports the ALJ's determination that Plaintiff has "no significant limitations in the performance of [the] basic mental demands of work." (R. 18). There is no record evidence regarding the degree to which stress impairs Plaintiff's mental abilities. Dr. Long opined that "stress would exacerbate symptoms," and that "[w]hen symptoms are active, this would be expected to negatively impact general functioning." (R. 229). *Cf. Buschle v. Astrue*, No. 10-cv-1535, 2012 WL 463443, at \*5, 2012 U.S. Dist. LEXIS 17455, at \*15-16 (Feb. 13, 2012) (finding no error in ALJ's decision not to consult with a vocational expert when ALJ's determination that non-exertional impairments would not significantly limit the range of work permitted by his exertional limitations was supported by doctor's opinion that that impairments were mild or moderate).

Thus, because the ALJ failed to consider the "intermediate question" of whether the range of unskilled work Plaintiff could perform was significantly diminished by the low stress limitations in the RFC, including a limitation on only occasional changes in work setting, remand is required to enable the ALJ to "seek the opinion of a vocational expert, or alternatively, explain why the Grid can be treated as dispositive under these circumstances." *Hernandez*, 2014 WL 3883415, at *16, 2014 U.S. Dist. LEXIS 109041, at *47; *see Novaco v. Berryhill*, No. 3:16-cv-1918, 2019 WL 1404189, at *14-17 (D. Conn. Mar. 28, 2019) (remanding where the ALJ "did not articulate why she concluded that" the plaintiff's limitations— "working in a 'low stress environment with only simple tasks . . . and only occasional interactions with co-workers and supervisors'" and the "ALJ's 'conclusory' finding that the impact of his non-exertional limitations was negligible, without further explanation failed to satisfy the . . . Commissioner's obligations at Step Five").

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED,** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order;

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: September 25, 2020
          Syracuse, New York

Brenda K. Sannes
U.S. District Judge